# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### April 25, 2014 Session

## RICHARD JEREMIAH GARRETT, JR. v. RENEE MICHELLE ELMORE

**Appeal from the Juvenile Court for Montgomery County**
**No. MC-JV-PL-CV-11-003779    Wayne C. Shelton, Judge**

---

### No. M2013-01564-COA-R3-JV - Filed July 29, 2014

---

The father of the parties' four-year-old child appeals the permanent parenting plan established by the juvenile court judge; specifically, he challenges the designation of Mother as the primary residential parent, the parenting schedule, the income imputed to each parent, and child support he is ordered to pay. He also contends Mother waived her right to a de novo rehearing of an earlier "order" by the magistrate, which favored Father, as she did not file a timely request for a de novo hearing; therefore, the juvenile court judge was without authority to conduct a de novo hearing or to enter judgment contrary to the magistrate's order. We have determined the magistrate's "order" was not a final judgment because the magistrate never prepared "findings and recommendations in writing," which are to be provided to the juvenile court judge, as is expressly required by Tenn. Code Ann. § 37-1-107(d). Following the de novo hearing before the juvenile court judge, Mother was named the primary residential parent and she was awarded 218 days of parenting time; Father was awarded 147 days. In calculating child support, the trial court found that Mother was attending college part-time but that she was voluntarily unemployed and imputed income to her based on federal minimum wage. The court found that Father's evidence concerning his modest income was unreliable and imputed income to Father pursuant to Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv). The court additionally afforded Mother a day care credit of $516 per month and set child support pursuant to the guidelines based upon the above findings. Father appeals. Finding no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT, J., and VANESSA AGEE JACKSON, SP. J., joined.

Amy J. Farrar, Murfreesboro, Tennessee, for the appellant, Richard Jeremiah Garrett, Jr.

Sharon T. Massey, Clarksville, Tennessee, for the appellee, Renee Michelle Elmore.

## OPINION

Richard Jeremiah Garrett, Jr. ("Father") and Renee Michelle Elmore ("Mother"), who had a brief relationship, are the parents of a son, born in 2009. Father voluntarily initiated child support payments of $200 per month, but discord between the parents soon evolved when Father failed to attend the child's birth and Mother believed Father was absent most of the child's first year of life, while Father was of the opinion that Mother was denying him reasonable and consistent visitation.

On September 2, 2011, Father filed a petition to establish paternity, a parenting plan, and child support for the child in Montgomery County, Tennessee. After a DNA test confirmed he was the child's father, the trial court awarded Father *pendente lite* parenting time on alternating weekends.

Mother filed her answer and counter-petition in December 2011, asking that she be declared the primary residential parent and that Father's visitation be limited until such time as he achieved a consistent relationship with the child. In August 2012, Father requested and was granted increased parenting time adding weekly visitation from Tuesday at noon to Wednesday at 4:00 p.m.

The competing petitions were tried before a magistrate on November 2, 2012. The magistrate entered an order that included a proposed parenting plan and a child support worksheet. The magistrate's order was entered on November 20, 2012, however, the magistrate did not provide written findings of fact and conclusions of law as mandated by Tenn. Code Ann. § 37-1-107(d). Moreover, for reasons unexplained by the record, the magistrate's order was neither affirmed nor denied by any juvenile court judge as contemplated by Tenn. Code Ann. § 37-1-107(f).

On December 17, 2012, one month after the magistrate's "order" was entered, Mother filed a motion requesting a de novo hearing before the juvenile court judge under the auspices of Tenn. Code Ann. § 37-1-107.[1] Father opposed the motion as untimely on the ground it was filed outside the five-day window set forth in the statute. Mother's motion was heard in February 2013, and the juvenile court judge granted the motion.

The juvenile court judge presided over the de novo hearing on April 29, 2013; both parents as well as the child's teacher and one of his daycare providers testified. The proof at trial showed that Mother had lived in an apartment in Clarksville, Tennessee, for eight years

---

[1]Tenn. R. Juv. P. 4 follows the language of the foregoing statute. For purposes of this opinion, we will limit our discussion to the statutory requirements.

with the parties' child and his two older siblings. After a 2010 lay-off from her job as a call center representative, she did not seek other employment. Instead, Mother had worked at home raising three children while she pursued a degree in public management from Austin Peay College on a part-time basis.

Father was employed as the executive director of a non-profit organization in the Clarksville area that provides youth development services to at-risk pre-teens and teenagers, an organization he founded. As of January 2012, he was also employed as a realtor with a brokerage firm for which he had sold two houses as of trial. Father married in September 2012 and was living with his family, including two step-daughters and a son, in a home approximately 20 miles from Mother's residence.

The parties' child, who was three at the time of trial, has a speech and language impairment for which he had been receiving private therapy twice a week since 2012. He was also attending a special needs pre-kindergarten program through the public school system, which provided additional therapy sessions three times per week. The child also attended day care on a frequent basis. While these proceedings were pending, Father enrolled the child in a second day care that was more convenient to Father, which the child attended during Father's visitation.

With respect to the upcoming 2013-14 school year, Mother and Father were not in agreement regarding the best education and therapy options for their son. Mother wished to enroll the child in Head Start, a program tailored to children with special needs at a local elementary school, while Father was pressing to enroll the child in a mainstream private school. Father also voiced opposition to continuing private therapy, but the child's therapists persuaded him that it was in the child's interest to continue therapy.

Following the conclusion of the de novo trial, the juvenile court judge adopted Mother's proposed parenting plan in an order entered on June 5, 2013. Mother was designated as the primary residential parent; she was allotted 218 days of parenting time and Father was allocated 147 days, and the parents shared decision-making authority. In making its ruling, the court found that Mother had served as the primary caretaker for an extended period of time and provided stability for the child who had special needs and was undergoing speech therapy. As for Father, the court found disfavor with Father's decision to add a different day care and his opposition to private speech therapy, neither of which the court found to be in the child's best interest.

The court set Father's monthly child support obligation at $760 per month, which was based on Mother's imputed income of $1,256 and Father's imputed income of $3,312 and a day care credit of $516 per month.

On appeal, Father contends the juvenile court judge erred by granting Mother a de novo hearing. He contends the parenting plan adopted by the juvenile court judge is fraught with error for the evidence preponderates against the judge's findings. Specifically, he contends the juvenile court erred: (1) in designating Mother the primary residential parent and by failing to maximize his parenting time; (2) in imputing Mother's income at $1,256 per month based on the minimum wage standard instead of $2,442, which is the guideline standard for female parents; and (3) by imputing income to him above the evidence he presented for he provided reliable evidence to establish his actual income. We shall address each in turn.

## ANALYSIS

## I. DE NOVO HEARING

We begin our analysis by evaluating whether the juvenile court judge erred by granting Mother a de novo hearing.

Father contends Mother's motion for a de novo hearing was untimely because it was filed more than five days after the magistrate's ruling was entered. Mother contends her motion was timely because the magistrate never prepared written findings and recommendations, as mandated by Tenn. Code Ann. § 37-1-107(d); therefore, it was within the discretion of the juvenile court judge to grant a de novo hearing on the competing petitions.

The hearing before the magistrate occurred on November 2, 2012, and the documentation approved by the magistrate that resulted from the hearing was entered on November 20, 2012. That documentation was limited to the magistrate's recommendations for a parenting plan and the child support worksheet. Pursuant to the proposed parenting plan, Mother was to be designated the primary residential parent with joint decision-making authority shared with Father. Parenting time was divided equally with 182.5 days awarded to each parent; Mother and Father were to alternate every other week and alternate holidays/vacations. The magistrate also recommended that no child support was to be paid by either parent based on a finding their respective earnings were fairly equal, $1,625 for Father and $1,256 for Mother. The magistrate, however, did not provide written findings of fact and conclusions of law as Tenn. Code Ann. § 37-1-107(d) requires. The statute provides:

(d) Upon the conclusion of the hearing in each case, the magistrate *shall transmit to the judge* all papers relating to the case, together with *the magistrate's findings and recommendations in writing.* Any hearing by a magistrate on any preliminary matter is final and not reviewable by the judge

-4-

of the juvenile court, except on the court's own motion . . . [A]ny matter that is a final adjudication of a juvenile shall not be construed to be a preliminary matter under this section and are reviewable by the judge of the juvenile court upon request or upon the court's own motion as provided in this section.

(e) Any party may, within five (5) days thereafter, excluding nonjudicial days, file a request with the court for a hearing by the judge of the juvenile court. The judge may, on the judge's own motion, order a rehearing of any matter heard before a magistrate, and shall allow a hearing if a request for such hearing is filed as herein prescribed. Unless the judge orders otherwise, the recommendation of the magistrate shall be the decree of the court pending a rehearing.

(f) In case no hearing before the judge is requested, or when the right to a hearing is waived, *the findings and recommendations of the magistrate become the decree of the court when confirmed by an order of the judge*. The final order of the court is, in any event, proof of such confirmation, and also of the fact that the matter was duly referred to the magistrate. A party may appeal such order pursuant to the provisions of Tenn. Code Ann. § 37-1-159.

Tenn. Code Ann. § 37-1-107 (emphasis added).

In two of the subsections above, the statute emphasizes the necessity of the magistrate preparing and providing written findings and recommendations. By the use of the term *shall* in subsection (d), the General Assembly has mandated that the magistrate provide written findings and recommendations. As we have previously held, the General Assembly's decision to require findings of fact and conclusions of law is "not a mere technicality." *Rogin v. Rogin*, No. W2012-01983- COA-R3-CV, 2013 WL 3486955, at *7 (Tenn. Ct. App. July 10, 2013) (quoting *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009)).

Subsection (f) also emphasizes the importance of written findings and recommendations for they may become the decree of the court, that being the juvenile court, if the right to a de novo hearing before the juvenile court judge is waived or unless the judge orders otherwise. More importantly, if the magistrate fails to make the statutorily required written findings and recommendations, there are no written findings or recommendations to become the decree of the court.

In this case the magistrate merely provided a parenting plan and a child support worksheet, which does not satisfy the mandatory requirements under Tenn. Code Ann. §

37-1-107(d). By its plain language, this statute allows a five-day window for an aggrieved party to seek review of a magistrate's decision in a juvenile case, which begins to run when the magistrate's findings and recommendations are "transmit[ted]" to the juvenile court judge. Tenn. Code Ann. § 37-1-107(d) and (e). Alternatively, the juvenile court judge may order a rehearing on its own motion. *Id*. The magistrate did not provide nor transmit to the juvenile court judge written findings and recommendations; therefore, the five-day time window never started. Accordingly, the juvenile court judge had the authority and acted within its discretion to grant Mother's motion for a de novo hearing on the competing petitions.

## II. PERMANENT PARENTING PLAN

Father urges on appeal that the trial court erred in designating Mother as the primary residential parent as well as in awarding parenting time of 218 days per year to Mother and the remaining 147 days to Father.

The evidence showed that Mother has lived in an apartment for eight years which she shares with the child and his two older siblings. She has worked primarily in the home since 2010, although she had been taking college courses. Father is the founder and executive director of a non-profit organization which provides youth development services to at-risk pre-teens and teenagers and is also employed as a realtor. He married in September 2012 and lives with his family, including two step-daughters and a son, in a home approximately 20 miles from Mother.

Both parents testified that they love the child, and Father testified that Mother was a good parent. The child has resided in Mother's home since his birth, and she has been the primary care giver. She testified that the child has a good relationship with his siblings. Mother testified she had been cooperative with Father in scheduling visitation and allowing access to the child, but that Father's visitation was sporadic. Father countered by asserting Mother accommodated his requests for visitation after their son's birth and while they were still a couple, but that her cooperation ceased when he ended their romantic relationship; he stated that she frequently and arbitrarily denied his requests to see the child, prompting him to file suit in 2011. He testified that Mother has not fostered his relationship with the child and has been unresponsive to his telephone calls and texts.

Father was initially granted temporary visitation every other weekend, but this visitation schedule was modified by the trial court in November 2012 to alternating weeks with each parent, seven days with Mother and then seven with Father, which remained the status quo until the second trial in April 2013.

-6-

The child, age three at the time of trial, suffers from a speech and language impairment. Mother has taken the initiative to obtain appropriate medical care and specialized therapy for the child's speech and language needs as recommended by the child's pediatrician. Specifically, the child began attending a special needs pre-kindergarten program three days a week in the public school system in the fall of 2012, and was also participating in private speech therapy sessions twice a week. The child had been progressing well per his speech therapist's testimony.

Mother typically took the child to daycare on the days he attended therapy or as needed if she had other commitments. She was planning for the child to enroll in the Head Start program in a neighboring elementary school for the 2013-14 school year. This program operated five hours daily, Monday to Friday. As such, she anticipated she would still need daycare for the child, as she planned to return to work. Mother desired to be the primary residential parent with residential time in her home during the week, and with three weekends per month and alternating Tuesdays allocated to Father which she felt would facilitate stability and structure; Mother was concerned that frequent transfers between two homes and two day cares was a burden to the child. The child's pre-kindergarten teacher, Tina Dotson, also testified that the child requires a highly structured program.

On the other hand, Father had been reluctant for the child to participate in private speech therapy due to the cost and was resistant to Head Start. He was convinced the better option was for the child to attend a private pre-school near his home during the 2013-14 school year. Mother testified that Father did not attend any of their child's doctor's appointments for the first three years of the child's life and was absent from his activities and school events such as class parties. Father responded in kind, testifying he had participated in the child's health care and therapy when afforded the "opportunity," but maintained that Mother "never allowed" him to attend these appointments. Father effectuated multiple changes in the child's environment in the year preceding trial, namely marrying, unilaterally placing the child in a second daycare facility near Father's home, and moving at least twice while this matter was pending. Father explained that he added the second daycare due to the cost of Mother's daycare and the proximity; he found driving back and forth to Clarksville, Tennessee, for day care inconvenient.

The trial court specifically noted that it had weighed the factors enumerated in Tenn. Code Ann. § 36-6-106. In finding that the comparative fitness analysis favored Mother, the court referenced the following:

> a. The Mother has been the primary caretaker of the child since his birth and until the schedule was changed after a hearing by the magistrate. At that time, the parties began exercising alternating week visitation.

b. The stability in the environment is of paramount consideration and the Mother has provided the stability for this child.

c. There have been several changes in the child's life since November [2012]. The Father added an additional daycare, the Father has moved, and the Father requested he be removed from speech therapy.

d. This child has special needs, specifically, his speech therapy needs.

e. The child has shown marked improvement in school since September 2012.

As a result, the trial court adopted Mother's proposed parenting plan, designating her as the primary residential parent, and allocating 218 days of residential time to Mother and 147 days to Father. Father was to have the child three weekends per month and every other Tuesday after school until Wednesday morning at school drop-off. During summer breaks, the child was to alternate weeks between Mother and Father, and holidays and vacations were either alternating or split equally.

Tenn. Code Ann. § 36-2-311 governs the procedure for establishing parentage, custody, parental access, and child support for a child born out-of-wedlock. "[N]either trial nor appellate judges have any responsibility greater than to attempt to correctly adjudicate child custody disputes." *Burden v. Burden*, 250 S.W.3d 899, 904 (Tenn. Ct. App. 2007) (quoting *Deitmen v. Deitmen*, No. 86-30-II, 1986 WL 6057, at *1 (Tenn. Ct. App. May 29, 1986)); *see also In re Zaylen R.*, No. M2003-00367-COA-R3-CV, 2005 WL 2384703, at *3 (Tenn. Ct. App. Sept. 27, 2005). "Trial courts have broad discretion in devising permanent parenting plans and designating the primary residential parent." *Burton v. Burton*, No. E2007-02904- COA-R3-CV, 2009 WL 302301, at *2 (Tenn. Ct. App. Feb. 9, 2009) (citing *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999)). Because custody and parenting schedules often hinge on subtle factors, including the parents' demeanor and credibility during the proceedings, we are reluctant to second-guess the trial court's decisions. *Johnson v. Johnson*, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004). "In reaching such decisions the courts should consider the unique circumstances of each case." *Burton*, 2009 WL 302301, at *2 (citing *Parker*, 986 S.W.2d at 563); *see also Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001). Trial courts are vested with broad discretion in fashioning parenting plans. *Burton*, 2009 WL 302301, at *2. Consequently, a trial court's decision regarding a permanent parenting plan will be set aside only when it falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

The gold standard by which the trial court determines and allocates the parties' parental responsibilities is the "best interest" of the child. *See* Tenn. Code Ann. § 36-6-106 (2012) and § 36-6-404 (2005). In designating the primary residential parent and defining the parameters of the residential schedule, the trial court is to rely on the well-known factors in these statutes identified immediately above. *Thompson v. Thompson*, No. M2011-02438-COA-R3-CV, 2012 WL 5266319, at *6 (Tenn. Ct. App. Oct. 24, 2012), *see Burden*, 250 S.W.3d at 908. These statutory factors are "substantially similar" and both permit the court to allow for consideration of any other factors that the court deems relevant. *Thompson*, 2012 WL 5266319, at *6. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the child's life after considering where the parents reside, the child's need for stability and all other relevant factors. *See* Tenn. Code Ann. § 36-6-106. However, the trial court is not required to specify each and every factor it relies on in making a custody decision. *See Murray v. Murray*, No. M2009-01576-COA-R3-CV, 2010 WL 3852218 , at *8 (Tenn. Ct. App. Sept. 28, 2010) (citing *Minton v. Fox*, No. E2005-02740-COA-R3-CV, 2006 WL 3017885, at *5 (Tenn. Ct. App. Oct. 24, 2006)).

The trial court affirmatively stated that it arrived at the permanent parenting plan based on an analysis of the relevant statutory factors, and we are able to correlate the trial court's findings with the associated factors. We easily discern that the trial court found Tenn. Code Ann. § 36-6-106(a)(2), (3), (4) and (6), and their essential equivalents in Tenn. Code Ann. § 36-6-404 favored Mother.[2] In conducting the best interest analysis, the trial court noted that stability and structure in the child's environment were "paramount" particularly in light of the child's speech and language impairment and ongoing therapy needs. We agree with the trial court that the evidence reflects that stability is paramount to the child's best interest, welfare, and success given his special needs. The proof at trial substantiates that Mother has offered that stability as the primary care giver, attending to his daily needs as well as his healthcare, therapy, and education, and that the child has thrived in her care. She has assumed the more active role in parenting the child. In comparison, Father's life at the time of trial had been laden with recent change, and he had voiced opposition to private therapy due to the cost. Additionally, his involvement in the child's early years was intermittent, at best.

A decision regarding the child's best interest should be designed to promote their best interests by placing them in an environment that will best serve their physical and emotional needs. *Barnes v. Barnes*, No. W2002-00428-COA-R3-CV, 2002 WL 31387268, at *3 (Tenn.

---

[2]It is apparent to us the same factual findings form the foundation for the trial court's conclusions that it was in the child's best interest that Mother be designated as the primary residential parent as well as the division of parenting time.

Ct. App. Oct. 23, 2002) (citing *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn.1999)). We are specifically instructed not to "tweak" a visitation order in the hope of achieving a more reasonable result than the trial court. *Eldridge*, 42 S.W.3d at 88. We would be remiss not to state that Father seems well-intentioned and obviously loves the child, but we find the evidence does not preponderate against the factors in both Tenn. Code Ann. § 36-6-106 and § 36-6-404 weighing in Mother's favor. In so finding, we are mindful that Mother is best equipped to meet the child's special needs.

The evidence in this record does not preponderate against the trial court's findings and its decisions regarding custody and the division of parenting time. Therefore, we affirm the designation of Mother as the primary residential parent and the parenting plan in general.

### III. CHILD SUPPORT

In setting child support, the trial court is responsible for first determining the gross income of the parents. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(1). Income may be imputed to a parent under three circumstances identified in Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i), namely:

(I) If a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed; or

(II) When there is no reliable evidence of income; or

(III) When the parent owns substantial non-income producing assets, the court may impute income based upon a reasonable rate of return upon the assets.

Once a court finds a parent willfully and/or voluntarily unemployed, the next step is to determine the parent's potential earnings or earning capacity, taking into consideration their educational level and/or previous work experience. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(II); *see also Luttrell v. Luttrell*, No. W2012-02279-COA-R3-CV, 2014 WL 298845, at *10-11 (Tenn. Ct. App. Jan. 28, 2014); *Dilley v. Dilley*, No. M2009-02585-COA-R3-CV, 2011 WL 2015395, at *7 (Tenn. Ct. App. May 23, 2011). The parent's earning capacity is the amount then used for child support calculation purposes. Tenn. Comp. R & Regs. 1240-02-04-.04(3)(a)(2)(ii)(II).

As noted above, the courts may also impute income "when there is no reliable evidence of a parent's income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(II). The Guidelines also provide examples of what constitutes "reliable evidence," such as "tax returns for prior years, check stubs, or other information for determining current ability to

support or ability to support in prior years for calculating retroactive support." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv)(I).

In such circumstances gross income for the current and prior years is determined by imputing annual gross income of $37,589 for male parents and $29,300 for female parents, which represents the full time median gross income for Tennessee. *Id.*

### A. MOTHER'S GROSS INCOME

Mother conceded that she was voluntarily unemployed, although she noted that this was due in part to the fact she was caring for three children and taking courses at Austin Peay State University; the trial court found that she was voluntarily unemployed. Instead of imputing the median gross income to Mother, the court imputed the minimum wage of $7.25. Father takes issue with this ruling, contending the trial court erred in utilizing federal minimum wage as the basis of Mother's monthly income in lieu of the statutory amount of $29,300 designated for female parents within the Guidelines. We find this argument is without merit.

Determining a willfully unemployed or underemployed party's potential income is a question of fact "requir[ing] careful consideration of all the attendant circumstances." *Miller v. Welch*, 340 S.W.3d 708, 712 (Tenn. Ct. App. 2010) (quoting *Reed v. Steadham*, No. E2009-00018-COA-R3-CV, 2009 WL 3295123, at *2 (Tenn. Ct. App. Oct. 14, 2009) (quoting *Owensby v. Davis*, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at *4 (Tenn. Ct. App. July 31, 2008))). Moreover, we review findings of fact concerning calculations of income with a presumption of correctness unless the evidence preponderates otherwise. *Johnson v. Johnson*, No. M2008-00236-COA-R3-CV, 2009 WL 890893, at *4-5 (Tenn. Ct. App. Apr. 2, 2009) (citing Tenn. R. App. P. 13(d); *Lindberg v. Lindberg*, No. 02A01-9407-CV-00169, 1995 WL 607557, at *2 (Tenn. Ct. App. Oct. 17, 1995)).

The evidence presented at trial reflects Mother has not been employed since a lay-off in 2010 from her job as a call center representative. She admitted that nothing was preventing her from gainful employment except for her child care responsibilities and the fact that she was pursuing a degree from Austin Peay State University in public management. Her typical course load was six credit hours per semester, although at the time of trial she was only enrolled in a three-hour web course. She applied for and obtained various student loans and grants over the years to cover her tuition costs as well as her family's living expenses. Mother estimated she would complete her degree in the next two and a half years. She further

stated that she planned to return to work in the fall of 2013. No written documentation of Mother's prior income was entered into evidence. Instead, Mother testified that her annual income for previous years was $16,055 in 2008 and $14,109 in 2010.[3]

As discussed above, a parent's child support obligation is not predicated on his or her actual income; rather, it is measured by earning capacity as evidenced by their educational level and work experience. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(II). The Child Support Guidelines parenthetically state that reliable evidence of such earning capacity may include "tax returns for prior years, check stubs, or other information for determining current ability to support." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iv). This is neither an exclusive list nor is it an absolute bar to the court's consideration of testimony. *See Armbrister v. Armbrister*, No. E2010-01561-COA-R3-CV, 2011 WL 5830466, at *6 (Tenn. Ct. App. Nov. 21, 2011) (holding it was proper for the trial court to rely on oral testimony to determine an underemployed party's income potential); *see also McDaniel v. McDaniel*, No. W2007-01587-COA-R3-CV, 2008 WL 5263605, at *7-8 (Tenn. Ct. App. Dec. 18, 2008).

The undisputed testimony was that Mother's previous employment had been limited to minimum-wage jobs and the trial court set her income based on the minimum-wage standard. Father contends this was error, asserting erroneously that the Guidelines require written documentation of one's income or earning capacity. Although such evidence is obviously preferable and often more reliable, such is not required in all cases. *See id.* Moreover, when one's prior wages or earning capacity is undisputed, as is the case here, documentation is not necessary.

There is no evidence in the record that Mother's earning capacity exceeds federal minimum wage, which is $7.25 per hour. *See* 29 U.S.C. § 206. The evidence in the record established that Mother's average monthly income for 2008 and 2010 was $1,256.83, which is consistent with minimum wage. Accordingly, we find no error in setting Mother's income for the purpose of child support.

### B. MOTHER'S STUDENT LOANS

Father contends, in the alternative, that the financial aid in the form of student loans Mother receives should also be imputed to her as income. Specifically, Father contends the trial court erred by not including Mother's student loans and grants in calculating her annual income. We find no error in the trial court's exclusion of Mother's financial aid in calculating her income.

---

[3]Mother was asked on cross examination whether her income in 2009 was $13,940, but the court reporter documented her response as "inaudible."

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(1) defines gross income as "all income from any source" including but not limited to wages, salaries, commissions, fees and tips, income from self-employment, bonuses, pensions or retirement plans, interest income, dividend income, trust income, annuities, net capital gains, and disability or retirement benefits. The regulatory definition of gross income does not include loans or student loans. Moreover, we find no basis to characterize loans, for which Mother incurs debt, as income.

Thus, we find no error with this decision.

C. Day Care Credit

The child support worksheet reveals that Mother was awarded a day care credit in the monthly amount of $516. Father contends that Mother is not entitled to the day care credit because she was neither working nor was she a full-time student. The trial court did not make any findings of fact on this issue or explain how it arrived at a $516 credit; therefore, we shall review the record de novo to determine where the preponderance of the evidence lies. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569-70 (Tenn. 2002); *Little v. City of Chattanooga*, No. E2013-00838-COA-R3-CV, 2014 WL 605430, at *3 (Tenn. Ct. App. Feb. 14, 2014).

Mother testified that beginning in August 2012, she took the child to a daycare on Tuesdays and Thursdays after speech therapy. Testimony from the child's day care provider and an accounting of daycare expenses in the record reflected weekly day care costs of $120. Mother was required to pay for a full-time day care space regardless of the number of days the child attended. From November 2012 to approximately February 2013, Father was also using this daycare during the alternating weeks he had custody. Mother testified that she was currently enrolled in and taking a three hour course, although she typically registered for six credit hours per semester; a school transcript entered into evidence reveals that Mother usually took six credit hours. Mother stated that she was laid off from work in 2010 and she had not worked since that time, but that she was planning to return to work in the fall of 2013.

The Guidelines allow an average monthly amount to be entered into child support calculations for "[c]hildcare expenses necessary for either parent's employment, education, or vocational training that are determined by the tribunal to be appropriate, and that are appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together." Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(c)(1); *see Kelly v. Kelly*, No. M2010-00332-COA-R3-CV, 2011 WL 310544, at *6 (Tenn. Ct. App. Jan. 20, 2011).

Mother typically paid a fixed amount of $120 per week for child care, which she incurred irrespective of the actual number of days that the child attended; thus, the average monthly cost for daycare would be $520, which is a negligible difference from the $516 allowance awarded by the court. The proof also showed that Mother typically took six hours of college courses per semester and that she was caring for two additional children.

Based on our review of the record, we have concluded the evidence does not preponderate against the trial court's finding that Mother should receive a child care expense credit of $516 per month.

### D. FATHER'S GROSS INCOME

Father contends the trial court erred in imputing statutory income of $37,589 per year to him because he presented "reliable evidence" of substantially less income.

Income may be imputed to a parent "when there is no reliable evidence of income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(II). However, as Father correctly states, a trial court may not impute income for purposes of calculating child support when "reliable evidence" of a parent's income has been presented. Thus, the median income amount is only available in the event reliable evidence of a parent's income or income potential is not presented. *In re Brittany M.A.*, No. M2010-02173-COA-R3-JV, 2011 WL 4600435, at *3-4 (Tenn. Ct. App. Oct. 5, 2011) (citing *Brewer v. Brewer*, No. M2005-02844-COA-R3-CV, 2007 WL 3005346, at *8 (Tenn. Ct. App. Oct. 15, 2007)). Thus, the question here is whether Father provided reliable evidence to establish his income. The trial court found Father's evidence of income less than reliable and we have determined that the evidence does not preponderate against this finding.

Father's tax returns for 2009, 2010, 2011, and 2012, were exhibited and showed an adjusted gross income for these years of $17,717, $11,485, $11,336, and $19,500, respectively. Mother introduced into evidence a loan application Father had recently submitted, which revealed that his current annual salary as the executive director of the non-profit organization was $26,400, an increase from $19,500 the previous year. It was also established that Father was additionally working as a real estate agent with a real estate brokerage firm in the Clarksville area, a position he started four months prior to trial. The evidence revealed that Father sold two homes in January and February 2013 for which he earned fees of approximately $9,500.[4] Father, however, testified that these figures were not representative of his potential income as his earnings were dependent on the real estate

---

[4]Father acknowledged this amount in his testimony, and this figure was also consistent with a paystub entered into evidence.

market; he also stated that he incurred significant expenses and he was responsible for paying self-employment taxes.

Based on the evidence in the record, including the recent increase in Father's earning capacity as a realtor and the court's conclusion that Father's financial evidence was not a reliable indicator of his earnings, the court imputed the statutory amount.

Considering the most recent changes in Father's employment and compensation, and the variability of Father's earning capacity, we have concluded the evidence does not preponderate against the trial court's decision to impute statutory income based upon Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(II).

### IN CONCLUSION

The judgment of the trial court is affirmed and costs of appeal are assessed against Father.

_____
FRANK G. CLEMENT, JR., JUDGE